IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 18, 2022 Session

**IN RE BRYLAN S.**

**Appeal from the Juvenile Court for McNairy County**
**No. 19-JV-44      Van McMahan, Judge**

_____

**No. W2021-01446-COA-R3-PT**

_____

In this termination of parental rights case, Appellant/Father appeals the trial court's termination of his parental rights to the minor child on the grounds of: (1) abandonment by an incarcerated parent by failure to support and by wanton disregard, Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(1)(A)(iv); (2) failure to manifest an ability and willingness to assume legal and physical custody of the child, Tenn. Code Ann. § 36-1-113(g)(9)(a)(iv); and (3) persistence of the conditions that led to the child's removal, Tenn. Code Ann. § 36-1-113(g)(3)(A). Father also appeals the trial court's determination that termination of his parental rights is in the child's best interest. Because Appellee Department of Children's Services does not defend the ground of persistence of conditions, we reverse the trial court's termination of Appellant's parental rights on that ground. We affirm the termination of Appellant's parental rights on all remaining grounds, and on its finding that termination of Appellant's parental rights is in the child's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Reversed in Part, Affirmed in Part, and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Nicholas L. Surratt, Savannah, Tennessee, for the appellant, David S.[1]

Herbert H. Slattery, III, Attorney General and Reporter, and Erica M. Haber, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Melissa G. Stewart, Savannah, Tennessee, guardian ad litem.

**OPINION**

---

[1] In cases involving minor children, it is the policy of this Court to redact the children's and the parties' names to protect their identities.

# I. Background

On or about July 1, 2019, Appellee Tennessee Department of Children's Services ("DCS") received a referral claiming that the minor child, Brylan S. (d.o.b. June 2018) (the "Child"), and other children not the subject of this appeal, were suffering from lack of supervision. At that time, Brylan was in the care and custody of his biological mother, Sarah K. After Brylan tested positive for methamphetamine, on December 26, 2019, the Juvenile Court for McNairy County ("trial court") adjudicated the Child dependent and neglected due to severe child abuse perpetrated by mother. On or about March 14, 2020, Sarah K. surrendered her parental rights, and she is not a party to this appeal.

When the Child was taken into DCS custody on or about July 27, 2019, Appellant David S. ("Father") was living at Safe Harbor. During his testimony, Father explained that that, in or around May 2019, he was living in Jackson and was homeless, so he "put himself through Memphis Mental Health for five days to sober up," and "put [himself] in Safe Harbor," a halfway house, which, according to Father, provides jobs, clothing, food, and "helps you get back on your feet." Father learned that Brylan was in foster care on or about July 29, 2019, but did not take any immediate steps to assume custody due to the fact that he was living at Safe Harbor. However, on or about April 13, 2020, Father wrote to the DCS case manager to inform her that he wanted custody of Brylan. On May 11, 2020, Father's wife, Mary S., whom he married on November 25, 2019 (two days after leaving Safe Harbor), moved to intervene and petitioned for temporary custody of the Child. Father filed a response stating that he "fully supports and agrees" with Mary S.'s motion and moved to set aside the December 26, 2019 adjudication and disposition order due to lack of notice. The trial court held a hearing on the motions. Father did not contest the dependency-and-neglect allegations or the allegations that led to the severe abuse finding against mother, but he did contest disposition and requested that custody be granted to Mary S. The trial court found that although Father had notice of the dependency-and-neglect proceedings, he had not been properly served with the petitions prior to the adjudicatory and dispositional hearing. Accordingly, and because Father did not contest the dependency-and-neglect finding, the trial court denied Father's motion to set aside the adjudicatory order but granted a new dispositional hearing. After a dispositional hearing on January 25, 2021, the trial court found that it was in Brylan's best interest to remain in DCS custody. The trial court noted that although Father completed six-months at a halfway house, he had not resolved his criminal issues and was incarcerated as of the date of the hearing. The court also noted that Father had only visited the Child twice—once at birth and once in November 2019. The trial court denied Mary S.'s motion to intervene because she was "not a good placement … due to Father's uncertain future and there being no relationship between she and Brylan."

Father has a long history of criminal activity and incarceration. On May 8, 2018, approximately one month before Brylan was born, Father was indicted in Carroll County

on burglary, theft of property, vandalism, possession of a controlled substance, and unlawful drug paraphernalia charges. On May 14, 2018, he pleaded guilty to burglary and theft of property charges. Father was sentenced to three years. In lieu of incarceration, Father was allowed to enter a rehabilitation program for not less than one year, for which he would receive day-for-day credit upon completion. However, if Father failed to complete the program, he would receive no credit for any time spent in the program. So, when the Child was born in June 2018, Father was in inpatient rehabilitation for methamphetamine use at Hope Center in Jackson. When he entered Hope Center, Father admitted to using methamphetamine for approximately eighteen months prior to treatment. Unfortunately, Father completed only three months of treatment before "turning himself back into the jail" in Carroll County, where he was incarcerated from approximately July 12, 2018 until December 4, 2018. On his release from the Carroll County jail, Father began using methamphetamine almost immediately.

On June 3, 2019, when Brylan was approximately one year old, Father was indicted on the following charges in Madison County: speeding, felony evading arrest, violation of financial responsibility, violation of open container law, reckless driving, violation of registration law, resisting a stop and frisk, driving on a cancelled, suspended, or revoked license, and possession of methamphetamine. On August 5, 2019, Father pleaded guilty to possession of methamphetamine, felony evading arrest, speeding, resisting a stop and frisk, and driving on a cancelled, suspended, or revoked license. According to Trial Exhibit 5, Father was sentenced to 3 years with 30% "[m]inimum service prior to eligibility for work release, furlough, trusty status and rehabilitation programs," after the first 30 days. The remaining sentence was suspended to community corrections supervision. The conditions of Father's community corrections were that he was required to pass random alcohol and drug screens, successfully complete treatment at Safe Harbor, maintain full-time employment or be a full-time student, and pay $100 per month toward costs and fines beginning thirty days after release from jail.

Before his plea on August 5, 2019, as of August 1, 2019, Safe Harbor reported that Father was doing well in the program. He attended weekly twelve-step recovery meetings and participated in the curriculum at Safe Harbor. In addition, Father was required to work while he was at Safe Harbor, and he worked twelve-hour shifts through a temp agency, and then as a maintenance worker at Safe Harbor on his days off. However, on August 6, 2019, Safe Harbor disciplined Father for failing to timely return from his pass and testing positive for methamphetamine when he returned, and it directed him to complete forty-five days in recovery. On November 23, 2019, after living at Safe Harbor for six months, and after getting into a dispute over a pass with staff, wherein he "just lost his temper," Father decided not to complete program. At this time, Brylan was seventeen months old.

Days after leaving Safe Harbor, on November 28, 2019, Father got into a physical altercation with Mary S.'s son. Father was arrested, but the charges were later dropped. At the time of trial, Father had been incarcerated for all but fifty-one days of his marriage to

Mary S.

After the Child was removed to DCS custody, Father had two probation violations—one in December 2019 and one in March 2020. On March 19, 2020, the Circuit Court for Madison County issued an order revoking Father's probation. Since his incarceration, Father has been denied parole twice, most recently in July 2021. Father's sentence was scheduled to be completed in March 2022, but Father testified he was eligible for good-time credit, making him eligible for release on January 6, 2022. According to trial exhibits, since Brylan's birth, Father has served the following periods of incarceration:

Carroll County
July 12, 2018 through December 4, 2018
February 14, 2019 through February 16, 2019
March 19, 2019 through March 29, 2019
December 18, 2019 through February 10, 2020

Madison County
February 2, 2019 through March 19, 2019
August 5, 2019 through August 5, 2019
November 28, 2019 through November 29, 2019
December 5, 2019 through December 16, 2019
March 11, 2020 and still incarcerated at the time of the hearing on the petition
to terminate his parental rights

On March 9, 2021, DCS filed a petition to terminate Father's parental rights. As grounds, DCS averred: (1) abandonment by an incarcerated parent by failure to visit, support, and by wanton disregard, Tenn. Code Ann §§ 36-1-113(g)(1), 36-1-102(1)(A)(iv); (2) substantial non-compliance with the requirements of the permanency plan, Tenn. Code Ann. § 36-1-113(g)(2); (3) persistence of the conditions that led to the Child's removal, Tenn. Code Ann. § 36-1-113(g)(3); and (4) failure to manifest an ability and willingness to assume custody, Tenn. Code Ann. § 36-1-113(g)(4). Prior to the hearing, DCS withdrew the ground of substantial non-compliance with the requirements of the permanency plan, and we will not discuss that ground. On September 21, 2011, the trial court heard the petition on the remaining grounds. By order of November 8, 2021, the trial court terminated Father's parental rights on the grounds of: (1) abandonment by an incarcerated parent by failure to visit and support, and by wanton disregard; (2) persistence of the conditions that led to the Child's removal; and (3) failure to manifest an ability and willingness to assume custody. The trial court held that DCS failed to meet its burden on the ground of abandonment by an incarcerated parent by failure to visit, and DCS does not appeal this finding. We further note that DCS does not defend the ground of persistence of conditions, and we conclude that the ground is inapplicable. As a threshold requirement for the ground of persistence of conditions, Tennessee Code Annotated section 36-1-113(g)(3)(A) states that the "child [must have] been removed from the home or the physical

or legal custody of [the] parent." Here, the Child was not in Father's physical or legal custody at the time of removal; accordingly, the threshold requirement for the ground is not met. Therefore, we reverse the trial court's termination of Father's parental rights on the ground of persistence of conditions, and we will limit our analysis to the remaining grounds of abandonment, and failure to manifest a willingness and ability to assume custody.

## II. Issues

We restate the dispositive issues as:

1. Whether there is clear and convincing evidence to support the trial court's termination of Father's parental rights on any of the statutory grounds found by the trial court.
2. If so, whether there is clear and convincing evidence that termination of Father's parental rights is in the Child's best interest.

## III. Standard of Review

As this Court has previously noted, the Tennessee Supreme Court has opined that:

A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clause of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Bobby G.*, No. E2021-01381-COA-R3-PT, 2022 WL 2915535, at *2 (Tenn. Ct. App. July 25, 2022) (quoting *In re Carrington H.*, 483 S.W.3d 507, 522-23 (Tenn. 2016) (footnote omitted)). Termination of parental rights proceedings are governed by statute in Tennessee, *In re Kaliyah S.*, 455 S.W.3d 533, 541 (Tenn. 2015), and the statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App.

2013) (quoting **In re W.B.**, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))) (internal quotation marks omitted).

Tennessee Code Annotated section 36-1-113 governs the termination of parental rights in Tennessee.  It provides, in pertinent part:

> (c) Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c).  Therefore, every termination of parental rights case requires the trial court "to determine whether the parent has engaged in a course of action or inaction that constitutes one of the statutory grounds for termination[]" and whether termination of the parent's rights is in the child's best interest.  **In re Donna E.W.**, No. M2013-02856-COA-R3PT, 2014 WL 2918107, at *2 (Tenn. Ct. App. June 24, 2014).  "Because the stakes are so profoundly high[]" in a termination of parental rights case, the statute "requires persons seeking to terminate a … parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence." **In re Audrey S.**, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).  This Court has observed that:

> This heightened burden of proof minimizes the risk of erroneous decisions. **In re C.W.W.,** 37 S.W.3d [467,] 474 [(Tenn. Ct. App. 2000)]; **In re M.W.A., Jr.,** 980 S.W.2d [620,] 622 [(Tenn. Ct. App. 1998)].  Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, **State Dep't of Children's Servs. v. Demarr,** No. M2002–02603–COA–R3–JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug.13, 2003) (No Tenn. R. App. P. 11 application filed), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. **In re Valentine,** 79 S.W.3d 539, 546 (Tenn. 2002); **In re S.M.,** 149 S.W.3d at 639; **In re J.J.C.,** 148 S.W.3d 919, 925 (Tenn. Ct. App.2004).  It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. **In re A.D.A.,** 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); **Ray v. Ray,** 83 S.W.3d at 733**; In re C.W.W.,** 37 S.W.3d at 474.

**Id.**

If it determines that clear and convincing evidence supports grounds for termination

- 6 -

in light of its factual findings, "the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d at 555. The party petitioning for the termination of parental rights bears the burden of demonstrating that termination is in the best interest of the child by clear and convincing evidence. *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010).

We review the trial court's findings of fact *de novo* upon the record with a presumption of correctness. Tenn. R. App. P. 3; *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016) (citations omitted). However, "[i]n light of the heightened burden of proof in termination proceedings … [we] must make [our] own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citation omitted). When the trial court has seen and heard witnesses, we give great deference to any findings that are based on the court's assessment of witness credibility. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citation omitted). We will not reverse a finding based on witness credibility unless the record contains clear and convincing evidence to contradict it. *Id.* The trial court's conclusion that clear and convincing evidence supports termination of parental rights is a conclusion of law that we review *de novo* with no presumption of correctness. *In re Carrington H.*, 483 S.W.3d at 524 (citation omitted).

The petitioner needs to establish only one of the statutory grounds set out in Tennessee Code Annotated section 36-1-113(g) to establish grounds for the termination of parental rights. *In re Angela E.*, 303 S.W.3d at 250. However, regardless of which grounds for termination are raised for our review on appeal, we must review the trial court's findings and conclusions as to each ground. *In re Carrington H.*, 483 S.W.3d at 525-26. We also must review the trial court's determination that termination is in the child's best interests. *Id.* With these standards in mind, we turn to our review of the trial court's findings of facts and conclusions of law in this case.

### IV. Grounds for Termination of Parental Rights

### A. Abandonment by an Incarcerated Parent

The trial court found, by clear and convincing evidence, that Appellant abandoned the Child. Tennessee Code Annotated section 36-1-113(g) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

As is relevant to this appeal, Tennessee Code Annotated section 36-1-102(1)(A)(iv) defines abandonment, in pertinent part, as follows:

(iv) A parent . . . is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent ... of the child who is the subject of the petition for termination of parental rights or adoption, or a parent . . . has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:
(a) . . . failed to support, or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the parent's or guardian's incarceration;
(b) . . . failed to support, or has failed to make reasonable payments toward the support of the child during an aggregation of the first one hundred twenty (120) days of non-incarceration immediately preceding the filing of the action; or
(c) Has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv)(a)-(c). For purposes of this subdivision "'failed to support' or 'failed to make reasonable payments toward such child's support' means the failure to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period." Tenn. Code Ann. § 36-1-102(1)(D). "'[T]oken support' means that the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B).

This Court has "indicated that the above definition 'contains multiple ways of abandonment for termination of parental rights.'" *In re Navada N*., 498 S.W.3d 579, 598 (Tenn. Ct. App. 2016) (citing *In re Kierra B*., No. E2012-02539-COA-R3-PT, 2014 WL 118504, at *8 (Tenn. Ct. App. Jan. 14, 2014)). We have explained that incarceration is a condition precedent for this definition of abandonment:

[A]bandonment by an incarcerated parent may only apply where the parent . . . "is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding."

*Id*. (citing Tenn. Code Ann. § 36-1-102(1)(A)(iv)). Here, Father's probation was revoked by order of March 19, 2020, and he was incarcerated when DCS filed its petition to terminate his parental rights on March 9, 2021. Concerning the applicable four-month time period, in its order terminating Father's parental rights, the trial court found: "[Father] was out of jail, except two days, from August 4, 2019 through December 4, 2019. This is the four-month period in question concerning abandonment by an incarcerated parent." Based on the foregoing definition, the trial court's application of this time period was correct. Tenn. Code Ann. § 36-1-102(1)(A)(iv).

In its order terminating Father's parental rights, the trial court found that he abandoned the Child both by failure to support and by wanton disregard. Concerning Father's failure to pay support, the trial court made the following findings:

> [Father] has failed to support or pay child support or make reasonable payments toward the support of the [C]hild for four (4) consecutive months immediately preceding incarceration.
> During this four-month period . . . [Father] worked at a paper company in Memphis, TN. [Father] ran a spooler at a paper company, pulling orders for amazon []. [Father] made $11.00 per hour. [Father] worked 24 hours one week and 60 hours the next, or 84 hours every two weeks. However, [Father] never paid any child support for minor [C]hild, although he was working and was earning enough to pay support. . . .

On appeal, Father does not specifically dispute the fact that he failed to provide support for the Child; however, he maintains that his failure to do so was not willful. At the time DCS filed its petition to terminate Father's parental rights, Tennessee Code Annotated section 36-1-102(1)(I) provided that

> [i]t shall be a defense to abandonment for failure to . . . that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. 36-1-102(1)(I). Absence of willfulness must be raised as an affirmative defense pursuant to Tenn. R. Civ. P. 8.03. Tenn. Code Ann. § 36-1-102(1)(I). Rule 8.03 provides that in raising an affirmative defense in a responsive pleading, "a party shall set forth affirmatory facts in short and plain terms relied upon to constitute" the defense. Tenn. R. Civ. P. 8.03. Father did not raise willfulness as a defense in his Answer and, in fact, did not raise this defense at any time in the trial court. As a result, he has waived this issue. *See **Pratcher v. Methodist Healthcare Memphis Hosps.***, 407 S.W.3d 727, 735 (Tenn. 2013) (citing Tenn. R. Civ. P. 12.08) (stating that "[a]s a general rule, a party waives an affirmative defense if it does not include the defense in an answer or responsive pleading");

*In re Imerald W.*, No. W2019-00490-COA-R3-PT, 2020 WL 504991, at *4 n.5 (Tenn. Ct. App. Jan. 31, 2020) (stating that a parent waives a lack of willfulness as an affirmative defense when the parent fails to raise the defense at trial).

However, even if we allow, *arguendo*, that Father preserved the issue of willfulness, his own testimony negates the defense and supports the trial court's finding that he abandoned the Child by failure to support. In relevant part, Father testified:

Q. [Father], are you aware, though, as a parent, you have a duty to support your children?
A. Yes, ma'am, and, you know, and—and what do you mean support them? Like. . . house, clothing—
Q. Do you understand that you have a duty to support your child?
A. Absolutely.
Q. Do you understand that that could include financial support?
A. Yes, ma'am.

***

Q. Have you provided?
A. Since I've been incarcerated? I mean, they took. . . my stimulus money and my income tax and but, I mean . . . the argument is []that it was involuntary but, I mean, it would have been voluntary. I mean, they didn't ask me to do that, which I would have gladly given it.

***

Q. So, you would agree, though, the support that has been made came from your stimulus check and an income tax; is that correct?

***

A. Yes, ma'am, because I didn't get any . . . paperwork saying I owed child support, how much it was, or anything.

When questioned by the guardian ad litem, Father admitted that, when he left Safe Harbor, he received $3,100 that he had saved from paychecks he received during his time there. He admitted, however, that he did not send any of this money to the Child:

Q. In your earlier testimony, you testified that you received an amount from savings when you left Safe Harbor; is that correct?
A. Yes, ma'am.
Q. And the approximate amount was three thousand one hundred dollars?

- 10 -

A. Yes, ma'am.

\*\*\*

Q. So, at that point [i.e., when he received the $3,100 and after Father visited the Child in November 2019] you knew your child was in foster care.
A. Yes, ma'am.
Q. During [the] visit was he still in diapers or was he potty trained?
A. He was still in diapers.
Q. Okay. So, you knew your child needed diapers.
A. Yes, ma'am.
Q. And you knew your child needed food to eat.
A. Yes, ma'am.
Q. You knew your child probably needed clothes to wear.
A. Yes, ma'am.
Q. Did you take any of that three thousand one hundred dollars and provide any of those things for your child?
A. No, ma'am, but I did help . . . his mother out.
Q. Did his mother have custody of him at that time?
A. No, ma'am.
Q. Where was he at [] that time?
A. He was in foster care.
Q. Okay. And you knew that?
A. Yes, ma'am.
Q. And yet not a penny of that money that you had saved up went to him.
A. No . . .

Father explained that the entire $3,100 was used as a down payment on the house he and Mary S. bought; however, the guardian ad litem pointed out the fact that Father is not listed on the deed for the house and has no legal ownership interest in the home.

We have reviewed the record, and we agree with the trial court that Father has failed to provide more than token support for the Child. Father was present at the Child's birth, yet he has failed to assume a parental role in any significant way, including paying support. While we acknowledge that Father has been incarcerated for most of the Child's life, in those periods where he was in a rehabilitation facility and working, he failed to provide anything for the Child. As such, there is clear and convincing evidence to support the trial court's decision to terminate Father's parental rights on the ground of abandonment by an incarcerated parent by failure to support.

Concerning abandonment by wanton disregard, the trial court found:

- 11 -

[Father] has engaged in conduct that exhibits a wanton disregard for the [C]hild's welfare. [Father] has had probation violations in Carroll County and Madison County, Tennessee. He has had repeated incarcerations, criminal behavior, substance abuse and possession of drugs, denial of parole, and he has failed to provide adequate support and supervision for the [C]hild. [Father] was denied parole in December 2020 and was not eligible for parole again until July 2021. [Father] was again denied parole in July 2021. These actions by [Father] amount to wanton disregard for the welfare of the [C]hild.

Father candidly admitted that he has been incarcerated for most of the Child's life:

Q Now. . . [s]ince your child's birth, the longest time you've ever been out of jail was a hundred and fifteen days; is that correct?
A. Yes, ma'am.
Q How old is Brylan now?
A. He's three years and . . . three months old.

The record is clear that Father has a long history of criminal activity, drug use, and incarceration. He testified that he has changed and is now ready to take on the role of parent. However, this Court has explained that "[i]n determining abandonment, the court is not to look at the protestations of affections and intentions by the natural parent, but must look at the past course of conduct of such parent." *Mosley v. Dowden*, No. 89-281-11, 1990 WL 7468, at *1 (Tenn. Ct. App. Feb. 2, 1990). From the record, Father's long history of criminal activity, frequent incarcerations, and past course of conduct belies his unproven intentions. As such, there is clear and convincing evidence to support the trial court's termination of his parental rights on the ground of abandonment by an incarcerated parent by wanton disregard.

### B. Failure to Manifest an Ability and Willingness to Assume Custody

The trial court also determined that Father failed to manifest an ability and willingness to assume custody or financial responsibility for the Child under Tennessee Code Annotated section 36-1-113(g)(14) and that placing the Child in his care would pose a substantial risk of harm.

Tennessee Code Annotated section 36-1-113(g)(14) provides a ground for termination of parental rights when

[a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial

- 12 -

responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14).

This ground for termination of parental rights requires the movant to establish two elements by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (citation omitted). Concerning the first element, DCS has the burden to prove that Father failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the Child. Tenn. Code Ann. § 36-1-113(g)(14). The Tennessee Supreme Court has adopted the interpretation of section 36-1-113(g)(14) set out in *In re Amynn K.*, No. E2017-11866-COA-R3-PT, 2018 WL 3058280 (Tenn. Ct. App. June 20, 2018); *see In re Neveah M.*, No. M2019-00313-SC-R11-PT, 2020 WL 7258044, at *14 (Tenn. Dec. 10, 2020) (citing *In re Amynn K.*, 2018 WL 3058280, at *14). The interpretation adopted by our Supreme Court places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal custody or financial responsibility for the child. If a parent seeking to terminate parental rights proves by clear and convincing evidence that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied. *In re Naveah M.*, 2020 WL 7258044, at *14. If the first element is met, then DCS must show that placing the Child in Father's custody poses "a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). In this case, the trial court held that DCS met its burden of proof as to both of these elements, to-wit:

[Father] . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child and placing the child in [Father's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.
. . .[Father] has failed to take the necessary steps to have custody given to him. [Father] has remained in jail for most of the time since removal and has failed to remedy his legal issues. [Father] will remain in custody until January or March of 2022.
Minor [C]hild has been in Foster Care over eighteen months after the [C]hild's removal and even after being informed of the necessary action steps numerous times, [Father] is still not in a position to care for minor [C]hild. Minor [C]hild remains lingering in foster-care and permanency is being delayed to the detriment of minor child.
[DCS] has proven, by clear and convincing evidence, the ground for termination contained in Tennessee Code Annotated section 36-1-113(g)(14) against [Father].

Father's testimony supports the trial court's findings, to-wit:

Q [Father], is it correct that you can't take custody of Brylan today?
A. No, ma'am; I can't.

Indeed, DCS case manager Jana Dugger testified that Father was not in a position to assume custody, to-wit:

Q Ms. Dugger, this may seem like a silly question, but what conditions exist now that would prevent Brylan to be returned to the custody of his father?
A. [Father] is still incarcerated.
Q. What else?
A. I mean, at this point, [Father] doesn't have any way to take care of Brylan. I mean, he's in prison.
Q. What other issues would need to be addressed . . . . [W]ould he need to demonstrate sobriety?
A. Yes.
Q. How is that demonstrated?
A. He would need to participate in some kind of NA/AA classes, pass random drug screens. I mean, there would be 1 some kind of . . . certificate of completion of some kind of program.
Q. Ms. Dugger, prior to [Father] going to jail, did you get any of these certificates?
A. No.
Q. According to the jail records that have been introduced, wasn't there also a period of time that [Father] was out of jail for at least a hundred and fifteen days?
A. Yes.
Q. And during that time, did you receive any certificates of completion of parenting classes?
A. No.

***

Q. Ms. Dugger, the documents you received that have been introduced today from Safe Harbor, do they show that [Father] had failed a drug test for methamphetamine?
A. Yes.
Q. After that documentation, did [Father] provide you anything during the times he was not incarcerated showing that he successfully completed intensive outpatient?
A. No.

- 14 -

***

Q Did [Father] provide you a lease?
A. No.
Q. Did he provide you proof of rent?
A. No.
Q. Did he provide you any documentation whatsoever to show that he had stable housing?
A. No

In addition to her testimony concerning Father's current inability to assume custody of the Child, Ms. Dugger also opined that placement with Father would likely cause harm to the Child:

Q. Ms. Dugger, if the [C]hild was to return to his F]ather's care and that disrupted or something happened, what would happen to the [C]hild then?
A. There's a possibility he'd come back in foster care.
Q. And would that start the process all over again?
A. Yes.
Q. Would that be another move for this [C]hild?
A. Yes.
Q. Do you have any trainings or any information during your training that you're required to know how moving a [C]hild from one time to another effects that child?
A. It sets them back developmentally six months.

Although it is not an absolute that removing Brylan from his current foster placement would cause him emotional issues or developmental delays, the fact that this is the only home the Child has ever know, the lack of any bond between Father and Brylan, and the Child's young age supports Ms. Dugger's opinion concerning the effect of a change in environment. Despite opportunities to pursue rehabilitation and to stay out of jail, Father has failed to successfully complete any program. Father would need to show a long pattern of stability before it would be safe for Brylan to be in his custody. This Court has held that similar circumstances have justified a finding of a risk of substantial harm to a child. *See, e.g., In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) (collecting cases) (citations omitted) (noting that substantial harm has been found in the following non-exclusive situations, which are analogous to this case: (1) "forcing a child to begin visitation with a near-stranger"; (2) "placing a child with a parent who engaged in repeated criminal conduct that required incarceration"; and (3) placing a child with a "significant, recent history of substance abuse[.]"). As such, there is clear and convincing evidence to support the trial court's finding that Father lacks the

ability to assume custody of Brylan and that removal of the Child from his current pre-adoptive placement would likely cause harm to the Child. Accordingly, we affirm the trial court's termination of Father's parental rights on this ground.

## V. Best Interest

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *In re Bernard T.*, 319 S.W.3d at 606 (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793 at 809). As the Tennessee Supreme Court explained:

> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. At the time of the filing of the petition to terminate Father's parental rights, the relevant statutory factors, included, but were not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established

- 16 -

between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

\*\*\*

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

\*\*\*

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This list of factors is not exhaustive, nor does the statute "require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W. 3d 652, 667 (Tenn. Ct. App. Aug. 11, 2005), *perm. app. denied* (Tenn. Nov. 21, 2005). Each termination of parental rights case includes different circumstances, and the consideration of a single factor or other factors outside those enumerated in the statute, may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

Ascertaining a child's best interests . . . does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 1994). However, "[w]hen considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2).

In its order terminating Father's parental rights, the trial court made the following best interest findings:

a. The best interest factors contained in T.C.A. § 36-1-113(i)(1) and T.C.A.

§ 36-1-113(i)(2) are applicable in this matter. These factors weigh in favor of termination because [Father] has failed to make the necessary adjustments. He is still incarcerated to this date and had not yet completed any of the action steps, except obtaining a home, which his new wife has done while he is in prison. [Father] has failed to take advantage of the programs offered by DCS and the court. [Father] has not completed parenting classes or drug rehabilitation. [Father] also failed to visit or support minor child. . . . [DCS] also made reasonable efforts in attempting to assist [Father] in completing the action steps . . . .

b. The best interest factor contained in T.C.A. § 36-1-113(i)(3) is applicable in this matter. This factor weighs heavily in favor of termination. [Father] has not had any contact or visitation with minor child, except one time since removal. [Father] testified he has only seen minor child maybe six times.

c. The best interest factor contained in T.C.A. § 36-1-113(i)(4) is applicable in this matter. This factor weighs heavily in favor of termination. There is no bond between [Father] and child. There is not much of an expectation that [Father] can accomplish this considering his criminal history and pattern of incarceration.

d. The best interest factor contained in T.C.A. § 36-1-113(i)(5) is applicable in this matter. This factor weighs in favor of termination. As mentioned earlier, the evidence is overwhelming that minor child would have extreme emotional and psychological harm if he is ripped from the only parents he has known. The court cannot imagine putting this young child through that scenario without assurances that [Father's] circumstances will improve. [Father] has failed to make a lasting adjustment after reasonable efforts by available social agencies for such duration of time that adequate and necessary change and adjustment does not reasonably appear likely. The court finds that if [Father's] rights are not terminated, minor child will no longer have stability and continuity of placement during a large portion of his minority. . . .

\*\*\*

f. The best interest factor contained in T.C.A. § 36-1-113(i)(7) is applicable in this matter. This factor weighs in favor of termination. As already stated above, [Father] is still incarcerated to this date and has not yet completed any of the action steps . . . .

\*\*\*

h. The best interest factor contained in T.C.A. § 36-1-113(i)(9) is applicable in this matter. This factor weighs in favor of termination of parental rights. As previously stated, [Father] worked at a paper company in Memphis, TN .

. . . [Father] made $11.00 per hour. [Father] worked 24 hours one week and 60 hours the next, or 84 hours every two weeks. However, [Father] never paid any child support for minor child, although he was working and was earning enough to pay support. A tax or stimulus intercept did recoup payments for 2020 for child support, but [Father] never made voluntary payments during 2019.

In addition to the foregoing findings, the trial court also found that: (1) Father "has failed to show any stability except for his incarcerations"; (2) Father "has not met any of minor child's basic needs"; (3) "there is no bond between [Father] and child"; (4) the Child "has a tremendous bond with the foster parents"; (5) "[Father] has never provided a safe and stable home for minor child," and has failed to demonstrate any urgency to do so; and (6) "other than government intercepts, has never provided support for minor child." From our review of the record, there is clear and convincing evidence to support the trial court's best interest findings.

Ms. Dugger testified:

Q. Ms. Dugger, what do you believe is in the best interests of this [C]hild?
A. For Brylan to be adopted.
Q. Why do you say that?
A. Brylan's been in foster care for over two years, and he needs permanency. He doesn't need to stay in foster care. Brylan really doesn't understand what foster care is. He just—he needs a family. He needs a forever family.
Q. Is he in a pre-adoptive home?
A. Yes.

For many of the foregoing reasons, the record supports Ms. Dugger's recommendation that termination of Father's parental rights is in Brylan's best interest. Father has failed to support or visit the Child. There is no bond between Father and Brylan. More urgent is the fact that Father's stability in housing and employment is unproven. By his own testimony, Father's use of methamphetamine played a large role in his numerous incarcerations. As of the hearing date, Father had not completed a rehabilitation program. Although he attended several, he always left before completion. So, neither his sobriety, nor his ability to avoid criminal behavior is proven. Meanwhile, Brylan, who is now four years old, has enjoyed stability in his foster home. He calls his foster parents his "mama" and "daddy." By all accounts, he is well adjusted and bonded with his foster family, and they are anxious to adopt him. To delay the Child's integration into the only home he has ever known in the hope that Father will remain sober, avoid further criminal charges, and maintain a stable home with his new wife, is not in the Child's best interest. Father has had numerous chances to achieve these necessary changes, but he has failed to do so. As such, we conclude that there is clear and convincing evidence to support the trial court's determination that termination of Father's parental rights is in Brylan's best interest.

## VI. Conclusion

For the foregoing reasons, we reverse the trial court's termination of Appellant's parental rights on the ground of persistence of the conditions that led to the Child's removal. We affirm the trial court's termination of Appellant's parental rights on the remaining grounds and on its finding that termination is in the Child's best interest. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, David S. Because David S. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

s/ Kenny Armstrong
KENNY ARMSTRONG, JUDGE